***********
In accordance with the directives of the North Carolina Court of Appeals, the Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pre-trial agreement and at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The Hartford is the carrier on the risk.
3. An employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $545.76.
5. The following exhibits were admitted into evidence:
 (a) Stipulated Exhibit 1: Pre-Trial Agreement
 (b) Stipulated Exhibit 2: Plaintiff's medical and rehabilitation records
 (c) Stipulated Exhibit 3: Industrial Commission Forms
 (d) Stipulated Exhibit 4: Assembly Production Chart
 (e) Stipulated Exhibit 5: Plaintiff's Out-of-Work Notes (submitted post hearing)
 (f) Plaintiff's Exhibit 1: Letter from plaintiff's prior attorney to defendant
 (g) Defendants' Exhibit 1: Employer's Report of Incident
 (h) Stipulated Exhibits (29) submitted at the July 13, 2007 hearing before the Chief Deputy Commissioner
 ***********
In accordance with the directives of the North Carolina Court of Appeals, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-eight years old, with a twelfth grade education. In addition, she had earned some community college credits. Plaintiff is also a certified home nursing assistant.
2. Plaintiff began working for defendant-employer in 1985. From 1993 until January 2002, plaintiff worked in the damper department assembling dampers. Since January 2002, plaintiff has worked in the warehouse counting stock.
3. Plaintiff alleges that her job in the damper department resulted in the development of an occupational disease. Plaintiff's job in the damper department involved work at four workstations, with four procedures for assembling dampers.
4. The first procedure at workstation one involved putting brackets on the blades. This required the use of a rivet machine. The worker would typically be sitting and would press a pedal to place the rivet in the blade. Once the worker had a set of blades, she moved onto the second procedure.
5. The second procedure involved a similar machine, except now the worker was placing the blades into a steel frame and using the rivet machine to rivet the blades into the frame. The worker stood at this machine and pressed the pedal.
6. The third procedure involved tying tie rods, which are plastic canoe clips, in brackets to attach the blades to the frames. This procedure was performed while standing.
7. The fourth procedure required the worker to box up, wrap up, or package the finished dampers. For heavier dampers, the worker would press a pedal to raise the table, thus making it easier to lift the damper. This procedure was performed from a standing position. *Page 4 
8. Plaintiff worked with another employee in the damper department approximately eighty-five percent of the time. During that time, plaintiff performed the first two procedures. The other fifteen percent of the time, plaintiff was required to perform all four procedures.
9. On August 3, 1996, plaintiff was working at station two when she twisted her body to pick up another steel frame and felt a pull in her left leg and hip. Plaintiff was performing her regular duties in the usual and customary manner when this occurred. In her contentions to the Commission, plaintiff did not argue that she suffered an injury by accident. Plaintiff reported the incident to her supervisor.
10. On August 6, 1996, defendants filed a Form 19 Employer's Report ofEmployee's Injury or Occupational Disease to the IndustrialCommission, wherein plaintiff complained that she felt pain in her left hip while operating the rivet machine.
11. In order to clarify whether there was an injury by accident or occupational disease, defendants attempted to contact plaintiff on several occasions to discuss plaintiff's alleged incident; however, they were unsuccessful in reaching plaintiff. On August 8, 1996, defendant-carrier sent a letter to plaintiff asking her to contact them to discuss the incident. Defendant-carrier attempted to record plaintiff's statement of the incident; however, plaintiff was uncooperative.
12. An August 27, 1996 letter from defendant-carrier to plaintiff summarized plaintiff's lack of cooperation and informed plaintiff that compensability could not be determined until the investigation was complete, including a recorded statement. Subsequently, plaintiff did provide a recorded statement; however, defendants maintained that it did not support an injury by accident. *Page 5 
13. On September 19, 1996, a nurse case manager for defendant-carrier wrote to Dr. Christensen at the Tabor City Family Medical Center, where plaintiff had received treatment for her hip asking if plaintiff's left hip and leg pain were related to plaintiff's work. On October 7, 1996, a physician's assistant indicated that plaintiff's degenerative changes were not job related but plaintiff may have had a soft tissue injury.
14. As of October 28, 1996, defendant-carrier's adjuster wrote to plaintiff to confirm an appointment with Dr. Sutton, an orthopedic specialist, and informed plaintiff that compensability would be determined after this appointment with Dr. Sutton on November 4, 1996.
15. On this same date, the adjuster also wrote to Dr. Sutton to provide him with plaintiff's medical records and to inform him that compensability had not yet been determined and asked him to consider whether there was a causal relationship between plaintiff's left hip complaints and her job description, which she provided.
16. On November 4, 1996, Dr. William R. Sutton evaluated plaintiff for her hip condition. Following an MRI, Dr. Sutton diagnosed plaintiff with degenerative arthritis of the left hip. Plaintiff received conservative treatment that failed to relieve her symptoms. Dr. Sutton recommended plaintiff undergo hip replacement surgery.
17. The adjuster continued her attempts to contact plaintiff to discuss her hip condition but was once again unsuccessful. Finally, on December 16, 1996, the adjuster wrote to plaintiff requesting that plaintiff contact her to complete the investigation.
18. Defendants provided Dr. Sutton with plaintiff's job analysis and a video of her duties. In a January 17, 1997 letter, Dr. Sutton opined that there was no causal relationship between plaintiff's left hip problems and her job duties and that plaintiff had avascular necrosis *Page 6 
of the left hip, which is premature degenerative arthritis. Defendants informed plaintiff in a March 27, 2000 letter that they would not pay for a hip replacement and could no longer pay for future medical treatment related to her hip based on Dr. Sutton's opinion that plaintiff's hip condition was unrelated to her work.
19. Plaintiff continued to treat with Dr. Sutton for her hip pain. Dr. Sutton tried an intra-articular corticosteroid injection but it did not provide relief. He prescribed Celebrex, encouraged plaintiff to lose weight and continued some work restrictions. Plaintiff did not improve and on July 8, 1999, Dr. Sutton spoke with plaintiff and her family about the possibility of a hip replacement. On August 27, 1999, Dr. Sutton opined that plaintiff did not have work-induced arthritis but an "exacerbation of her underlying arthritic condition that she injured and had subsequent pain."
20. Dr. Sutton further opined that the hip replacement he had recommended was not related to any work incident and that the simple act of walking could exacerbate plaintiff's condition. Dr. Sutton further opined that plaintiff's work did not cause, but did aggravate, her degenerative arthritis. Although Dr. Sutton opined that plaintiff's work placed her at an increased risk for such aggravation, he offered no opinion regarding whether plaintiff's employment exposed her to a greater risk of developing degenerative arthritis than the general public.
21. The Full Commission finds plaintiff's premature degenerative arthritis and the hip replacement recommended to treat it, unrelated to any soft tissue injury she may have incurred on July 8, 1999. *Page 7 
22. The greater weight of the medical evidence of record reveals and the Full Commission so finds that plaintiff was not placed at an increased risk of developing degenerative arthritis as compared to the general public.
23. On June 14, 2000, plaintiff filed a Form 33 Request That Claim BeAssigned For Hearing based on defendants' refusal to pay for a second opinion regarding the necessity of hip replacement surgery. On August 14, 2000, defendant filed a Form 61 Denial of Workers' CompensationClaim [G.S. § 97-18(c) and G.S. § 97-18(d)
24. On January 18, 2001, by Order of Deputy Commissioner Taylor, plaintiff's claim was withdrawn from the hearing docket at the request of the parties. On November 15, 2001, plaintiff filed a second Form 33 on the basis of defendants' denial of plaintiff's hip replacement surgery. On August 2, 2002, Deputy Commissioner Baddour heard plaintiff's case and on July 29, 2003, filed an Opinion and Award denying her claim for an occupational disease. Plaintiff filed an appeal to the Full Commission, which on August 12, 2004, affirmed the denial of benefits by the Deputy Commissioner.
25. On September 10, 2002, plaintiff filed a Form 18 Notice ofAccident to Employer and Claim of Employee. Defendants have not pleaded any defense based on plaintiff's late filing of her Form 18 so there has been no procedural or substantive detriment to plaintiff with respect to her claim.
26. Even though defendant-carrier voluntarily paid medical benefits to or on behalf of plaintiff, which included treatment for her left hip, defendants have never asserted to the Industrial Commission or plaintiff that they were accepting her hip condition as compensable and never filed an Industrial Commission form to this effect. Defendants never paid indemnity benefits to plaintiff. On several occasions, defendants informed plaintiff and Dr. Sutton that they *Page 8 
had not accepted plaintiff's claim as compensable. In addition, the evidence revealed that plaintiff had been uncooperative in providing information to defendants in order to assist defendants in determining compensability. On December 16, 1996, defendants again wrote to plaintiff asking her to contact them to complete the investigation. In January 1997, Dr. Sutton opined that there was not a causal connection between her left hip condition and her work.
27. As noted herein, plaintiff filed her first Form 33 Request ThatClaim Be Assigned For Hearing on August 14, 2000, citing defendants' failure to pay for a second opinion regarding hip replacement surgery. This was the first time plaintiff filed a "claim" of any sort. Thereafter, defendants filed a Form 61, Denial of Workers' CompensationClaim Denial of Workers' Compensation Claim [G.S. § 97-18(c) and G.S.§ 97-18(d)].
28. Defendants did not make payments to plaintiff pursuant to either N.C. Gen. Stat. § 97-18(b) or (d). Defendants never initiated any payments of indemnity compensation to plaintiff. In fact, plaintiff did not claim she was entitled to indemnity compensation. Defendants only made payment for medical bills without any concurrent payment of indemnity.
29. Plaintiff's claim failed based solely upon the medical testimony provided by the parties. The greater weight of the credible medical evidence in the record failed to establish a compensable occupational disease of degenerative arthritis in plaintiff's left hip. Moreover, there is insufficient evidence of record to support a finding that plaintiff sustained an injury by accident or specific traumatic incident on August 3, 1996. Therefore, in effect, the Commission determined that defendants did not owe these medical payments, which had been made and for which no reimbursement had been sought.
30. Moreover, no grounds exist herein to invoke the doctrine of estoppel. Plaintiff did not miss any compensable time from work. Defendants paid only plaintiff's medical bills *Page 9 
and did not pay plaintiff indemnity compensation. Defendants never represented to plaintiff that her claim had been accepted, that everything had been taken care of, or that they would pay all her medical bills indefinitely. Therefore, plaintiff cannot claim that she had been lulled into thinking that her claim had been accepted. To the contrary, the record revealed that plaintiff had been uncooperative from the inception of the claim in providing information to defendants that may have assisted them in determining compensability at an earlier time.
 ***********
In accordance with the directives of the North Carolina Court of Appeals, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show: (1) the disease is characteristic of individuals engaged in the particular trade or occupation in which the plaintiff is engaged; (2) the disease is not an ordinary disease of life to which the public is equally exposed with those engaged in that particular trade or occupation; and (3) there is a causal relationship between the disease and the claimant's employment. Rutledge v. TutlexCorp., 308 N.C. 85, 301 S.E.2d 359 (1983).
2. In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development. Hardin v. Motor Panels, Inc., 136 N.C. App. 351,524 S.E.2d 368 (2000) [citing Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983)]. It must be shown factually that claimant's occupational exposure was such a significant factor in the development of the occupational disease that without it the disease would not have developed to such an extent that it caused physical disability that resulted in claimant's incapacity for work. Wilkins v. J.P. Stevens Company, 333 N.C. 449, 426 S.E.2d 675 (1993). *Page 10 
3. In the present case, plaintiff has failed to establish that she suffers from an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13) and is not entitled to recover benefits under the Act.
4. An "accident" involves more than merely carrying on the usual and customary duties in the usual way, but rather involves the interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Harding v. Thomas HowardCompany, 256 N.C. 427, 124 S.E.2d 109 (1963); see also Davis v. RaleighRental Center, 58 N.C. App. 113, 292 S.E.2d 763 (1982). In the present case, plaintiff has not established an injury by accident. N.C. Gen. Stat. § 97-2(6).
5. Section 97-25 of the North Carolina General Statutes requires or permits an employer to pay bills for medical and other treatment of an employee, and the payment of such bills, approved by the Commission, even without formal denial of liability, cannot have the effect of an admission of liability by the employer or constitute a waiver of the requirement of filing a timely claim by the employee as provided in N.C. Gen. Stat. § 97-24. Such facts are insufficient to invoke the doctrine of estoppel. The statute permits the humanitarian conduct on the part of the employers of the State. Aside from any statutory provision on the subject, such conduct cannot in any sense be deemed an admission of liability. Biddix v. Rex Mills, 237 N.C. 660, 75 S.E.2d 777 (1953) [citing Brown v. Wood, 201 N.C. 309, 160 S.E. 281]; Kanipe v. LaneUpholstery, 141 N.C.App. 620, 540 S.E.2d 785 (2000); Harrison v. LucentTechnologies, 156 N.C.App 147, 575 S.E.2d 825 (2003).
6. Plaintiff is not entitled to any further medical treatment. N.C. Gen. Stat. § 97-2(19).
 *********** *Page 11 
In accordance with the directives of the North Carolina Court of Appeals, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim is hereby, and the same shall be, denied.
2. Each side shall pay its own costs.
This the ___ day of May 2008.
S/________________ PAMELA T. YOUNG CHAIR
CONCURRING:
 S/_______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________________ DIANNE C. SELLERS COMMISSIONER *Page 1